UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TECH-SONIC, INC., | : | No. 3:12-cv-01376 (MPS) |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SONICS & MATERIALS, INC., | : | |
|     Defendant. | : | August 7, 2015 |

_____

## MEMORANDUM OF DECISION

**I.     Introduction**

In this case, plaintiff Tech-Sonic, Inc. claims that defendant Sonics & Materials, Inc. breached an exclusive sales agreement.[1] The defendant has moved to dismiss the case for lack of subject matter jurisdiction, arguing that the plaintiff lacks standing to bring the suit. On the same day as that motion was filed, both parties moved for summary judgment on the merits of the case. The Court will deny the defendant's motion to dismiss because the plaintiff's standing, and thus the Court's jurisdiction, cannot be determined as a matter of law at this stage and must be decided after an evidentiary hearing or during the course of trial. The Court will deny the motions for summary judgment without prejudice to renewal if jurisdiction is found to exist.

**II.    Facts**

Plaintiff Tech-Sonic, Inc. ("TS USA") is an Ohio corporation formed in June 2005 with its principal place of business in Columbus, Ohio. ECF No. 50, Second Am. Compl. ("Compl.") ¶¶ 1, 19. TS USA is in the business of developing, manufacturing, selling, and distributing ultrasonic metal welding machines, and replacement tooling for such machines. *Id.* ¶ 1.

---

[1] The plaintiff originally made other related claims, but all claims except for breach of contract were dismissed by the Court on February 28, 2013. ECF No. 63.

Defendant Sonics & Materials, Inc. ("Sonics") is a Delaware corporation with its principal place of business in Newtown, Connecticut. *Id.* ¶ 2. Sonics is in the business of providing, among other things, ultrasonic metal welding systems for bonding conductive materials in applications such as wire splicing, wire termination, battery tabbing, cable processing, seam welding, and tube sealing. *Id.*

TS USA is affiliated with a South Korean company known as TechSonic Co. ("Original TS"), *id.* ¶ 11, as well as a Chinese entity known as Beijing TechSonic Equipment Co., Ltd. ("TS Beijing"), ECF No. 129-1, Pl.'s L.R. 56(a)(1) Statement ("Pl. 56(a)(1) Stat.") ¶ 8. Byoung Ou ("Ou") is the president of TS USA and was the sole shareholder and director of Original TS. Compl. ¶¶ 9, 12. A fourth affiliate, TechSonic Korea ("TS Korea") was formed in September 2005 and registered in the name of Sung Min Cho ("Cho"), Ou's brother-in-law. Pl. 56(a)(1) Stat. ¶ 10; ECF No. 119-4 at 122, Exh. L to Miodonka Decl. ("TS Korea Registration"). At some point, Original TS shifted at least some of its business to TS Korea. Pl. 56(a)(1) Stat. ¶ 10; ECF No. 134-1, Def.'s L.R. 56(a)(2) Statement ("Def. 56(a)(2) Stat.") ¶ 10.

On February 21, 2005, Sonics and Original TS entered into an exclusive sales agreement, which granted Original TS the exclusive right to purchase and sell Sonics's 40 kHz power supplies and converters to be incorporated into metal welders in Asia ("the Agreement"). Compl. ¶¶ 13-14. The Agreement provides, in relevant part:

> 1. [Sonics] will give TechSonic Company, exclusive rights to purchase and sell the [Sonics] 40kHz power supplies and converters, to be incorporated into TechSonic metal welders in Asia.
> 2. TechSonic Co. does not have exclusive rights to purchase and sell the [Sonics] 40kHz power supplies and converters for applications that are not for metal welding.
> . . .
> 6. [Sonics's] responsibilities are to provide power supplies and converters in a timely manner, honor it's [sic] warranties, and provide repair services for TechSonic Co. in [Sonics's] facility when required.

> 7. Techsonic Co. agrees to indemnify [Sonics] against all losses and damages incurred by Techsonic Co., by reason of any claims filed by Techsonic Co. customers.
> . . .
> 10. This Agreement provides the entire understanding between the parties and may not be altered except by a document in writing, executed by an authorized officer of TechSonic Co. and by [Sonics] or their authorized agent.

ECF No. 119-4 at 44, Exh. E to Miodonka Decl. The Agreement was later terminated, effective October 10, 2009. ECF No. 95 ("Summary Judgment Ruling").

On January 1, 2011, Ou executed a document entitled "Actions Without a Meeting by the Sole Shareholder and Sole Director of TechSonic Co.," which provides, in relevant part:

> The Corporation is a party to that certain Sales Agreement dated February 21, 2005 . . . between the Corporation and [Sonics] . . . . The Corporation believes [Sonics] is in breach of the Sales Agreement . . . . The Corporation has been dissolved and is in the process of winding up its affairs and . . . hereby does, assign to [TS USA], and its successors and permitted assigns, all of its right title and interest in and to the [Sonics] Claims, including the right to prosecute and pursue such claims in civil litigation, the right to settlement and compromise the [Sonics] Claims and to benefit from any damages or settlement proceeds received from [Sonics], its successors or permitted assigns as a result of any of the foregoing.

ECF No. 119-4 at 86, Exh. G to Miodonka Decl.

TS USA alleges that Sonics breached the Agreement by making sales to other Asian customers during the term of the Agreement. *See* Compl. ¶¶ 44-45; Def. 56(a)(2) Stat. ¶¶ 13-15. Sonics denies that its actions constituted a breach of the Agreement, and it also argues that TS USA lacks standing to bring this lawsuit. Specifically, Sonics claims that on March 31, 2008, Original TS "ceased operations and was dissolved," having previously "transferred *all* of its business, operations, and assets to its successor, TS Korea." ECF No. 119-1, Mem. L. Sup. Def.'s Mot. Dismiss ("Def. Mot. Dis.") at 5 (emphasis added). Thus, says Sonics, when Ou executed the January 1, 2011 document purporting to assign rights under the Agreement from Original TS to TS USA, there was nothing to assign, and therefore TS USA has no right to enforce the Agreement. Sonics

3

also argues that even if TS USA has standing to enforce the Agreement, it lacks standing to assert any damages. *Id.* at 14-22.

Sonics points to three sources of evidence suggesting that Original TS's assets had already been transferred prior to January 2011. First is Ou's May 21, 2014 deposition:

> Q: Ok. And at the time when you dissolved TechSonic in March of 2008—
> A: Yes.
> Q: —at that time were all of the assets transferred to TechSonic Korea from TechSonic Co.?
> A: Well, all the business and everything.
> . . .
> Q: So TechSonic Korea took over for TechSonic Co., is that correct?
> A: Yes. Same people, same thing. . . . So we use [Cho's] name temporarily, until we formally set up as TechSonic Korea as the branch office of Tech-Sonic U.S.
> . . .
> Q: Was there ever a formal assignment of assets from TechSonic Co. to TechSonic Korea?
> A: There was nothing.
> . . .
> Q: Okay. And I think you also said that even before March 2008, but certainly as of March 2008, TechSonic Korea, the business in Mr. Cho's name, was doing all of the business that TechSonic Co. had been doing, is that correct?
> A: No. I used his name, registered that in TechSonic Korea, and everything was continued and same; people, money, assets, everything.
> Q: Contracts?
> A: Yeah.

ECF No. 119-4 at 19, Exh. B to Miodonka Decl. ("Ou May 2014 Dep.") at 14, 20, 30.

Second is a complaint filed by Ou in a Korean court in February 2012. ECF No. 119-4 at 47, Exh. F to Miodonka Decl. ("Korean Complaint"). In the Korean Complaint, Ou sued his brother-in-law Cho, disputing the ownership of TS Korea. *Id.* Ou claimed that although TS Korea was registered in Cho's name for official purposes, Ou was the true owner in substance. *Id.* Ou also accused Cho of stealing TS Korea's business by transferring it to Kormax System ("Kormax"), another business entity registered in Cho's name. *Id.* Ou's complaint was dismissed as lacking merit. ECF No. 119-2 at 16, Exh. C to Han Decl. ("Korean Decision"). Sonics points to a portion of the Korean Complaint in which Ou alleged that he

4

> agreed to complete all existing transactions of Tech-Sonic Co., Ltd. [i.e., Original TS] in reality and to close down the business according to [Cho's] recommendations, established a proprietorship in the trade name of Tech-Sonic Korea under the name of [Cho] around September 1, 2005, and transferred the existing business assets that had been held by Tech-Sonic Co., Ltd. [i.e., Original TS] such as sales, human resources, accounts, etc., to Tech-Sonic Korea and continued the business operation.

Korean Complaint at 5-6.

Third is the fact that by letter dated August 18, 2007, Ou authorized the closure of Original TS, and the company was formally dissolved on March 31, 2008, according to a government record, events that, according to Sonics, bely any claim that Original TS retained its rights under the Agreement to be assigned three years later to TS USA. ECF No. 119-4 at 119, Exh. K to Miodonka Decl. ("Ou Letter"); ECF No. 119-4 at 125, Exh. M to Miodonka Decl. ("Certificate of Dissolution").

In response, TS USA claims that Original TS never assigned rights under the Agreement prior to the January 1, 2011 transfer to TS USA and that the transactions between Original TS and TS Korea involved the transfer of its Korean business to TS Korea, rather than all of Original TS's assets. ECF No. 136, Pl.'s Mem. Opp. Def.'s Mot. Dismiss ("Pl. Opp. Dis.") at 7. While acknowledging the 2008 dissolution of Original TS, TS USA contends that Original TS did not liquidate and distribute its assets in the years following its closure and that Original TS therefore retained ownership of TS Beijing as well as its rights under the Agreement. *Id.* at 9-11.[2]

Supporting this claim are Ou's own affidavits and a Chinese business license listing "Techsonic Co., Ltd." as "Shareholder (Founder)" of TS Beijing. ECF No. 119-4 at 119, Exh. I to Miodonka Decl. ("Chinese License"); ECF No. 136-1, Ou Oct. 2014 Decl. ¶¶ 5, 9-11; ECF

---

[2] *See generally* Korean Commercial Act, Article 245 ("To the extent necessary for achieving the objectives of liquidation, a company shall be deemed to continue to exist even after its dissolution."), available at <http://elaw.klri.re.kr/eng_service/main.do> (last visited July 16, 2015).

No. 125-2, Ou Sept. 2014 Decl. ¶ 25 ("Once TechSonic Korea was formed, TechSonic shifted its *Korean* business and sales to TechSonic Korea.") (emphasis added). TS USA also argues that Sonics has unfairly characterized Ou's deposition testimony, pointing to other portions of testimony that support its characterization of the transactions between Original TS and TS Korea:

> Q: Was there every any formal assignment of assets from TechSonic Co. to TechSonic Korea.
> A: There was nothing.
> Q: No formal documentation?
> A: No formal. Nothing, nothing.
> Q: No document for tax purposes, anything like that?
> A: No.
> Q: Just TechSonic Korea just took over the business?
> A: Yeah. I mean we slowly, you know, we informed customers, yes.

ECF No. 136-2, Ou May 2014 Dep. at 20-21.

> Q: All the assets of Tech-Sonic Co. were transferred to TechSonic Korea—
> A: No.
> Q: —in March 2008 when it was—correct?
> A: No.
> . . .
> Q: What happened to Tech-Sonic Co.'s ownership interest in Beijing Tech-Sonic when Tech-Sonic Co. dissolved in 2008?
> A: Nothing.

ECF No. 136-3, Ou August 2014 Dep. at 37-38, 44.

### III.  Sonics's Motion to Dismiss for Lack of Subject Matter Jurisdiction

For the reasons set forth below, Sonics's motion to dismiss for lack of subject matter jurisdiction is denied without prejudice.

#### A.  Legal Standards

"A plaintiff claiming [Article III standing] must establish, first, that it has sustained an injury in fact which is both concrete and particularized and actual or imminent; second, that the injury was in some sense caused by the opponent's action or omission; and finally, that a

favorable resolution of the case is likely to redress the injury." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, --- F.3d ----, No. 13-3325, 2015 WL 3875220, at *3 (2d Cir. June 24, 2015) (quotation marks and citations omitted). In addition, "[t]he prudential standing rule . . . bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *United States v. Suarez*, --- F.3d ----, No. 14-2378-CR, 2015 WL 3953289, at *2 (2d Cir. June 30, 2015) (quotation marks omitted).

"Once [a] motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) put[s] . . . Article III standing in issue, the District Court has leeway as to the procedure it wishes to follow." *Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006). "[T]he plaintiff's averment of jurisdictional facts will normally be met in one of three ways: (1) by a Rule 12(b)[] motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency, (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, or (3) by a request for an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). "If the defendant asserts in a Rule 56 motion that undisputed facts show the absence of jurisdiction, the court proceeds, as with any summary judgment motion, to determine if undisputed facts exist that warrant the relief sought." *Id.* "[I]f a genuine dispute of material fact exists, the Court may conduct a hearing limited to Article III standing . . . [o]r, where the evidence concerning standing overlaps with evidence on the merits, the Court might prefer to proceed to trial and make its jurisdictional ruling at the close of the evidence." *Alliance*, 436 F.3d at 88.

7

B.   Discussion

Sonics has not requested an evidentiary hearing on the issue of jurisdiction and asserts that "[t]he facts pertaining to the Court's subject matter jurisdiction are not in dispute." Def. Mot. Dis. at 2.[3] Therefore, at this stage, in the absence of an evidentiary hearing, the Court will assess the evidence under a Rule 56 standard. As elaborated below, the Court denies Sonics's motion to dismiss because there are genuine disputes of material fact that prevent the Court from determining the issue of jurisdiction without an evidentiary hearing. The Court will either hold a separate evidentiary hearing on that issue or decide the issue after hearing the evidence at trial—a choice the Court will make after hearing from the parties at a status conference to be convened following entry of this ruling.

i.   Dispute as to the Assignment of Rights to TS USA

Because "an assignee can sue based on his assignor's injuries," *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008), whether Original TS in fact assigned its rights under the Agreement to TS USA is material to the question of TS USA's standing in that it "might affect the outcome of the suit under the governing law," *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). The Court must therefore determine whether there is a genuine dispute as to that fact. *See Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) ("A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") (citations and quotation marks omitted).

---

[3] *See also* Def. Mot. Dis. at 12 ("It cannot be seriously disputed that the Company was dissolved no later than March 31, 2008, and that it has not engaged in any operations or paid any taxes since that time. It is also very clear that the Company transferred all of its personnel, assets, business operations and *contracts* to a successor entity, TS Korea, at or about the same time. Despite these undisputed facts, Plaintiff would have the Court believe that the Company transferred the entirety of its operations and assets to TS Korea *except for* its rights in the Sales Agreement, which rights it sat on for almost three years before assigning them to Plaintiff.") (citations omitted).

Construing the entire record in the light most favorable to TS USA, the Court finds a genuine dispute as to this issue. Sonics has not presented any documents directly evidencing a pre-2011 transfer of assets, including rights under the Agreement, from Original TS to TS Korea. And a reasonable fact-finder would not necessarily conclude from the three sources of indirect evidence—Ou's deposition, the Korean Complaint, and the documents relating to Original TS's dissolution in 2008—that Original TS no longer possessed rights under the Agreement when Ou executed the January 2011 assignment to TS USA.

Ou's deposition testimony is ambiguous in its characterization of the transactions between Original TS and TS Korea, especially in light of what appears to be a possible language barrier or at least confusion about what was being asked. *See* Ou August 2014 Dep. at 46-47 ("The question again? . . . I don't understand what he's saying. . . . Question again? I don't understand the words."). Although Ou agrees in his testimony that "all the business" and "contracts" were transferred, he never states that rights under the Agreement were transferred away by Original TS prior to being assigned to TS USA in 2011. A reasonable fact-finder could interpret Ou's reference to "all the business," together with the later clarification in his affidavit—which does not directly contradict the deposition testimony—and the fuller record, to mean that all *Korean* business operations were transferred to TS Korea, while Original TS retained control over actual or prospective operations elsewhere, including ownership of TS Beijing. This is supported by the Chinese License, which appears to postdate Original TS's dissolution, showing Original TS's continued ownership of TS Beijing.

That version of events could also be reconciled with a reasonable interpretation of the Korean Complaint, which refers to the plans between Ou and Cho as a venture to create a "Korean Branch Office," and is a creditable explanation of what occurred following the 2008 dissolution. In the absence of any documents directly evidencing liquidation or distribution of

9

Original TS's assets, a reasonable fact-finder could decline to draw the inference that Sonics urges—i.e., that Original TS distributed all its assets either before or soon after dissolution—and instead credit Ou's claim that Original TS retained assets, including rights under the Agreement, after dissolution. Ou's version of events is not, as Sonics argues, patently implausible. Original TS may well have had reason to retain its rights under the Agreement—which by its own terms applies to sales in all of Asia, not only in Korea—for various purposes, such as potential assignment to TS Beijing (which, the evidence in the record would permit a reasonable fact-finder to conclude, also remained as an asset of Original TS), notwithstanding the plan to transfer certain business to TS Korea and create a new "Korean Branch Office."

### ii.    Dispute as to Damages

Sonics also argues that, even if rights under the Agreement were validly assigned to TS USA so that it may assert claims based on injuries to Original TS, the only injuries that are alleged are the profits that were lost by Original TS's subsidiary TS Beijing, which cannot be recovered by Original TS or its assigns. Def. Mot. Dis. at 14. Even if that argument is correct and Original TS itself suffered no actual damages, however, Original TS and its assigns would still have standing to sue for breach of the Agreement. Nominal damages for breach of contract are unavailable under Connecticut law, *Lydall, Inc. v. Ruschmeyer*, 919 A.2d 421, 449 (Conn. 2007), and Article III standing does not disappear merely because a plaintiff's damages are limited to nominal damages, *see J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 650-51 (7th Cir. 2014) ("When one party fails to honor its commitments, the other party to the contract suffers a legal injury sufficient to create standing even where that party seems not to have incurred monetary loss or other concrete harm."); *UV Indus., Inc. v. Sharon Steel Corp.*, 631 F. Supp. 1219, 1221 (S.D.N.Y. 1986) (rejecting "[d]efendant's claim that plaintiffs lack standing," because "[p]laintiffs, as parties to a contract, allege a breach of that contract" and "[i]n the event

of a breach, the wronged party is entitled at least to recover nominal damages"). Thus, even if there were no genuine dispute about the existence of actual damages, Sonics would not be "entitled to judgment as a matter of law" on the issue of standing and this Court's jurisdiction. Fed. R. Civ. P. 56(a).

### IV.     The Parties' Motions for Summary Judgment

Because there is a genuine dispute of material fact as to whether TS USA has rights under the Agreement and therefore standing to bring this lawsuit, the Court also denies without prejudice TS USA's motion for summary judgment. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999) ("To prevail on a Federal Rule of Civil Procedure 56 motion for summary judgment . . . a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits."); *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir. 1983) ("For a plaintiff to prevail on summary judgment when defendant contests personal jurisdiction . . . he must demonstrate that there is no genuine issue as to any material fact on the jurisdictional question.").

As to Sonics's motion for summary judgment, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998), instructs this Court not to reach the merits while Sonics's jurisdictional objection remains unresolved. *Steel Co.* expressly rejects the exercise of so-called "hypothetical jurisdiction"—that is, the practice of "proceed[ing] immediately to the merits question, despite jurisdictional objections, . . . where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." *Id.* at 93. "A doctrine of 'hypothetical jurisdiction' that enables a court to resolve contested questions of law when its jurisdiction is in doubt . . . produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Id.* at 101. "[F]ederal courts should be certain of their jurisdiction

11

before reaching the merits of a case." *Id.* at 110 (O'Connor, J., concurring). Because, for the reasons already stated, the Court is unable to resolve Sonics's jurisdictional objection until evidence is heard, either at trial or at a separate evidentiary hearing, any judgment on the merits must also await the hearing of evidence. Sonics's motion for summary judgment is therefore denied without prejudice.

Depending on the procedural path the Court follows to resolve the factual questions concerning the assignment, the Court may permit the parties either to renew their summary judgment motions or to renew their arguments at trial through motions for judgment as a matter of law. After conferring with the parties, the Court will decide whether to hold a separate evidentiary hearing to resolve the jurisdictional issue or to decide the issue in the context of the trial.

## V.     TS USA's Motion to Strike

TS USA moves to strike several of Sonics's filings. It first moves to strike two of Sonics's submissions in support of its summary judgment motion that were filed between midnight and 1:00am on September 24, 2014, less than an hour past the dispositive motions deadline of September 23, 2014. It also moves to strike portions of Sonics's briefing as excessively long. Although Sonics's two motions both comply with the 40-page limit for briefs under D. Conn. L.R. Civ. P. 7(a)(2), TS USA argues that the two motions should be considered as a single 54-page dispositive motion because the motion to dismiss for lack of jurisdiction relies upon submissions beyond the pleadings. Finally, it moves to strike from the record documents and expert testimony that it claims were not properly disclosed by Sonics during discovery—specifically, affidavits by two attorneys offering analysis of Korean and Chinese law

(ECF Nos. 119-2, 119-3), and various translated documents. For the following reasons, the motion to strike is denied in its entirety.[4]

"Under Fed. R. Civ. P. 12(f), a court may strike 'any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter' from a party's pleading." *Ricci v. Destefano*, No. 3:04 CV 1109 JBA, 2006 WL 2666081, at *1 (D. Conn. Sept. 15, 2006). "[M]otions to strike are disfavored and not routinely granted, and it is the movant's burden to demonstrate prejudice by the inclusion of the alleged offending material." *Holmes v. Fischer*, 764 F. Supp. 2d 523, 532 (W.D.N.Y. 2011). "Rule 12(f) allows a court to strike pleadings only," and "[t]herefore it is inappropriate to strike material contained in exhibits to motions." *Ricci*, 2006 WL 2666081, at *1. "Parties . . . may point out in their summary judgment briefing evidence that they believe should not be considered because it is inadmissible or immaterial, but they may not utilize a motion to strike to make such arguments and thereby evade the page limits for a summary judgment brief." *Id.* at *3.

Even if the Court were to construe TS USA's motion to strike as an argument that certain pieces of evidence submitted by Sonics should be excluded from consideration, rather than formally stricken from the record, it would deny TS USA's request. The Court finds good cause to grant Sonics's *nunc pro tunc* motion to extend the deadline for summary judgment filings by one day if only because doing otherwise might result in denying relief based on the technicality of a narrowly missed deadline. As for the length of Sonics's briefing, TS USA has cited no authority for the proposition that Sonics's two briefs, which address logically distinct matters and seek different relief, should be treated as part of a single motion for the purposes of L.R. 7(a)(2),

---

[4] Although this motion relates in part to the summary judgment motions, which the Court does not reach and denies without prejudice, it also relates in part to the motion to dismiss, which the Court has reached and denies without prejudice because of the presence of genuine disputes of material fact.

and in any event, the Court would grant Sonics permission under L.R. 7(a)(2) to file 54 pages of briefing on the issues in this case.

The Court also declines to exclude evidence that, according to TS USA, was inadequately disclosed during discovery. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). "The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008). In deciding whether to preclude evidence under Rule 37(c), a court considers "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). "[A]lthough a 'bad-faith' violation of the Rule 26 is not required in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006). "[P]reclusion is a drastic remedy and it is generally ordered only where the court finds that the party's failure to comply with the requirements was both unjustified and prejudicial." *Equant Integrations Servs., Inc. v. United Rentals (N. Am.), Inc.*, 217 F.R.D. 113, 118 (D. Conn. 2003) (quotation marks omitted).

Even if Sonics had a duty to disclose the two attorneys as expert witnesses during discovery, Sonics's explanation for the failure to disclose—that it provided the affidavits solely for the purpose of legal argumentation and to aid the Court in its assessment of foreign law—does not suggest bad faith "sandbagging" or even an unreasonable interpretation of its duties

under the Federal Rules of Civil Procedure.[5] Nor has there been any meaningful prejudice. As it relates to the motion to dismiss, the issue is moot because the Court did not rely on the affidavits in reaching its conclusions. *See, e.g.*, *Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 230 (D. Conn. 2005) ("In reaching its decision on the two motions for summary judgment, the Court did not rely on this material that Defendants seek to strike. Therefore, Defendants' Motions to Strike . . . are denied as moot."). And going forward, should the issue of foreign law arise again, TS USA will have had plenty of time to prepare its own arguments or affidavits regarding foreign law in response, which the Court would permit TS USA to submit.

TS USA has cited no authority for its claim that Sonics had a duty to disclose its translator as an expert witness during discovery. As for production of the translations themselves, "[a]lthough the case law on this issue is also relatively sparse, the courts that have ruled on it have found that the party responding to document demands are under no obligation under the Federal Rules to translate documents produced." *Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 274 F.R.D. 437, 441 (E.D.N.Y. 2011); *accord Briese Lichttechnik Vertriebs GmbH v. Langton*, 272 F.R.D. 369, 374 n.4 (S.D.N.Y. 2011). Even assuming *arguendo* that some such disclosure obligation existed, TS USA was not meaningfully prejudiced by not receiving the translations earlier. TS USA has not challenged the accuracy of any of the translations submitted by Sonics. And to the extent that TS USA would have benefitted from having translated versions of the documents at an earlier stage, it could have secured translations

---

[5] Although offered by an "expert," foreign legal analysis is arguably more akin to legal argumentation than evidence. *See* Fed. R. Civ. P. 44.1 (providing that a ruling on "an issue about a foreign country's law . . . must be treated as a ruling on a question of law"). *Compare Silberman v. Innovation Luggage, Inc.*, No. 01 CIV. 7109 GELDF, 2002 WL 31175226, at *2 (S.D.N.Y. Sept. 30, 2002) ("[A] party is entitled to discovery regarding its adversary's foreign law expert, just as it is entitled to discovery regarding any other kind of expert."); *with Universal Trading & Inv. Co. v. Kiritchenko*, No. C-99-03073 MMC (EDL), 2007 WL 2141296, at *4 (N.D. Cal. July 25, 2007) ("Defendant need not provide the expert reports of any person who will be providing information on foreign law solely to the court."); *and BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil*, 184 F.R.D. 3, 9 (D.D.C. 1999).

itself using its own resources. Sonics has represented—and TS USA has not claimed otherwise—that TS USA had access to all the original Korean and Chinese documents during discovery. Further, both of Sonics's dispositive motions were denied, and TS USA's dispositive motion was denied because of a genuine factual dispute about jurisdiction that would exist on the basis of Ou's deposition alone. Should the translated documents continue to be relevant in future proceedings, TS USA will have already had access to them, as well as information about the translator, for many months.

## VI.    Conclusion

For the reasons set forth above: The Motion to Dismiss for Lack of Jurisdiction (ECF No. 119) is DENIED without prejudice. The plaintiff's Motion for Summary Judgment (ECF No. 123) is DENIED without prejudice. The defendant's Motion for Summary Judgment (ECF No. 126) is DENIED without prejudice. The defendant's Motion for Extension of Time *Nunc Pro Tunc* (ECF No. 138) is GRANTED. The plaintiff's Motion to Strike (ECF No. 135) is DENIED.

A telephonic status conference will be held on August 24, 2015, at 3:00pm to discuss scheduling, including the deadline for the parties' joint trial memorandum and whether to hold a separate evidentiary hearing on the issue of jurisdiction in advance of trial. Chambers will email the parties with call-in instructions.

**SO ORDERED** this 7th day of August 2015 at Hartford, Connecticut.

  /s/
Michael P. Shea
United States District Judge