## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TECH-SONIC, INC.,<br>    Plaintiff,<br>        v.<br>SONICS & MATERIALS, INC.,<br>    Defendant. | No. 3:12-cv-01376 (MPS) |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.      Introduction**

This is a breach of contract case between the plaintiff Tech-Sonic Inc. ("TS USA") and the defendant Sonics Materials ("Sonics"). Tech-Sonic Co. ("Original TS"), a South Korean stock corporation, entered into an exclusive sales agreement ("Agreement") with Sonics. Original TS then purportedly assigned the right to sue under the Agreement to TS USA. TS USA has sued Sonics under the Agreement. The parties contest whether the assignment was effective and thus whether TS USA has standing to sue under the Agreement. The effectiveness of the assignment turns on two issues: (1) whether at the time of the purported assignment Original TS owned the Agreement that it purported to assign, and (2) whether the purported assignment was an effective corporate action under South Korean law.

As discussed in more detail below, TS USA has not met its burden of showing that the purported assignment of the Agreement was an effective corporate action under South Korean law and thus that it is the assignee of the Agreement. Under South Korean law, a stock company such as Original TS can assign a so-called "major asset" only through a resolution of the board of directors. The sole shareholder or chief executive officer, known as a "representative director," of such a stock company cannot unilaterally assign the company's major assets. The Agreement is a major asset of Original TS. At the time of the purported assignment, Original TS had three members of the board of directors. Although TS USA submitted a document purporting to make

the assignment, signed by Byoung Ou, Mr. Ou was not the sole member of the board of directors at that time. As there is no evidence of a valid resolution by the board of directors of Original TS effectuating the assignment, TS USA has not shown that it is the assignee of the Agreement. Therefore, TS USA lacks standing.

In the alternative, TS USA has requested leave to amend its complaint under Federal Rule of Civil Procedure 17 so that Original TS may join the case, ratify the lawsuit, or be substituted as a party. I deny that request because Rule 17 cannot cure a jurisdictional defect in this context.

Thus, I dismiss this case for lack of jurisdiction because TS USA lacks standing.[1]

## II.      Procedural History

TS USA filed this suit on March 26, 2012 in the United States District Court for the Southern District of Ohio. On September 21, 2012, the case was transferred to the United States District Court for the District of Connecticut. On February 28, 2013, the Court granted Sonics' Motion to Dismiss all of the claims against it except for a breach of contract claim. On September 23, 2014, Sonics moved to dismiss for lack of subject matter jurisdiction and both parties moved for summary judgment. I denied those motions without prejudice after determining that genuine disputes of material fact prevented me from deciding the jurisdictional issue as a matter of law. On January 8, 2016, I held an evidentiary hearing to resolve the jurisdictional question. The sole witness at the hearing was Byoung Ou, principal of TS USA.[2] I have also considered post-hearing and supplemental briefs submitted by the parties, together with exhibits including, among others,

---

[1] The defendant asks me to find that the plaintiff is entitled to no more than nominal damages. (ECF No. 152 at 5.) I decline to do so and limit my findings to those required to adjudicate the jurisdictional issue.

[2] Mr. Ou is a native Korean speaker and, as he acknowledged at the hearing, his English is not strong. I had difficulty understanding his testimony at times and often had to repeat or rephrase questions posed by counsel in order to be sure that Mr. Ou understood the questions he was being asked and that I understood his testimony.

a deposition given by a South Korean lawyer retained by Sonics and affidavits by a South Korean lawyer retained by TS USA.

## III.    Legal Standard

A district court *sua sponte* "must first resolve the subject matter jurisdictional issue on which the Plaintiff's Article III standing depends before awarding either side a judgment that is, in essence, a judgment on the merits." *Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 83 (2d Cir. 2006); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). A court may consider evidence outside of the pleadings in deciding whether it has subject matter jurisdiction. *Building & Const. Trades Council v. Downtown Develop., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006). After jurisdictional discovery, if there is a genuine issue of material fact the court may hold an evidentiary hearing on Article III standing unless the court's "fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury . . . ." *Alliance for Environmental Renewal, Inc.*, 436 F.3d at 88. In this case, both parties expressed a preference that the court hold an evidentiary hearing and decide the jurisdictional issue without a jury and before trial. The plaintiff has the burden of establishing standing under Article III by a preponderance of the evidence. *Aurecchione v. Schoolman Transp. Systems, Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

"[T]o have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (*i.e.,* a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.,* a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is 'likely' and not 'merely speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint*

3

*Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 273–74 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). At issue is whether TS USA suffered an injury in fact.

Deciding the effectiveness of the assignment in this case requires the Court to apply South Korean law. "[A] court's determination of foreign law is treated as a question of law . . . ." *Karah Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 80 (2d Cir. 2002). "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

## IV. Findings of Fact

I assume the parties' familiarity with the facts and allegations and set forth only my findings on the facts related to jurisdiction.[3]

### A. The Purported Assignment From Original TS to TS USA

Sonics and Original TS entered into a contract on February 21, 2005. (Pl.'s Ex. 5 at 1.) Some time after October 22, 2011, Byoung Ou, an owner of Original TS, signed a document called "Action Without a Meeting by the Sole Shareholder and Sole Director of Techsonic Co. (Gyeonggi-Do, South Korea)." (Pl.'s Ex. 6 at 1; Def.'s Ex. 103 at 1–3; Hr. Tr. at 106, 108–09.) The document purports to assign to TS USA the right to bring suit under the contract between Original TS and Sonics. (Pl.'s Ex. 6 at 1.) The document states that Original TS was formed as a *Yuhan Hoesan*, which is similar to a closely-held corporation. (Pl.'s Ex. 6 at 1.) However, Original

---

[3] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice-versa.

TS is a *Chusik Hoesa*, which is more akin to a stock corporation. Robert L. Brown, *Corporate Counsel's Guide to Doing Business in South Korea* § 6:5 (Thomson Reuters 2014); (Ri Bong Han Dep. at 81–82, Jan. 5, 2015, ECF No. 153; Hearing Tr. at 111–12). The document is also back-dated; it was not signed until after October 2011, but the document states that it is effective as of January 1, 2011. (Hearing Tr. at 110–12.)

### B.     Original TS's Ownership of the Right of Action at the Time of the Purported Assignment

Sonics has argued that Original TS did not own the right of action at the time of the purported assignment, having earlier assigned it to a different entity. I find, however, that Original TS owned the Agreement when it purportedly assigned it to TS USA some time after October 2011. Mr. Ou's testimony on this issue was not crystal clear, but a few points emerged with sufficient clarity to permit the following findings. At some point, the Korean government gave a $300,000 grant to Original TS for research and development. (Hearing Tr. at 43.) Original TS was required to return thirty percent of the grant to the Korean government. (*Id.*) To avoid the repayment obligation, Mr. Ou, at the advice of his brother-in-law, Seong Min Cho, reported to the Korean tax authorities that Original TS was, in effect, closing down its Korean operations; although Mr. Ou signed a letter to this effect in August 2007 while he was living in the United States, Mr. Cho, who was running the Korean operations for Mr. Ou, did not deliver it to the Korean authorities until 2008. (*Id.* at 42–46; Pl.'s Ex. 4 at 1; Def.'s Ex. 100 at 1.)

The Korean operations of Original TS, but not the Agreement or other intangible assets, were assumed by a non-stock corporation owned entirely by Mr. Ou known as Tech Sonic Korea ("TS Korea"). (Hearing Tr. at 42–46, 51–53.) There was no evidence of a formal assignment of assets—let alone an assignment of the right of action—by Original TS to TS Korea, and although Sonics has pointed to other documents submitted or subscribed to by Mr. Ou suggesting that "all

5

assets" were transferred to TS Korea, I find that those alleged contradictions stem from Mr. Ou's language difficulties. In 2004, Original TS had set up another entity in China to handle its operations there—Beijing Techsonic ("TS Beijing"). (*Id.* at 40.) Translations of records from the Chinese government show that Original TS remains the "investor" and "shareholder" in TS Beijing, confirming that Original TS did not assign all its assets to TS Korea. (Pl.'s Ex. 2 at 1; Pl.'s Ex. 3 at 1.)

Even though Original TS told Korean tax authorities that it was closing, Original TS continued to do business with Sonics. Mr. Ou testified that his brother-in-law and TS Korea had no dealings with Sonics and that his brother-in-law did not even speak English.[4] (*Id.* at 54–55, 57–58.) Mr. Ou testified that only he and his wife—who had relocated to the United States and set up TS USA—dealt with the defendant, Sonics, under the Agreement. (*Id.* at 54–58.) Mr. Ou testified that he and his wife placed orders with Sonics on behalf of Original TS or TS USA; product was delivered to TS USA, which sent the product to TS Korea or TS Beijing for incorporation into welding equipment. (*Id.* at 55–59.) Thus, I find that at the time of the purported transfer, Original TS owned the Agreement that it allegedly assigned to TS USA.

As discussed below, whether the assignment of the Agreement was effective under South Korean law turns on the number of directors of Original TS at the time of the purported assignment, whether Mr. Ou could assign the Agreement as the sole shareholder of Original TS, and whether the Agreement was a "major asset."

---

[4] Mr. Ou won a civil lawsuit in South Korea against his brother-in-law related to his brother-in-law's wrongly taking ownership of TS Korea. (Hearing Tr. at 48–52.)

### C.        Number of Directors at the Time of the Purported Assignment

For the reasons that follow, I find that there were three members of the board of directors of Original TS at the time the resolution purporting to assign Original TS's right of action to TS USA was "adopted," which was some time after October 22, 2011.

According to translations of the corporate registry introduced into evidence, Original TS is a stock corporation with 50,000 issued shares of common stock and total capital of 500 million Korean won. (Pl.'s Ex. 1 at 1.) The registry shows that three directors were appointed or re-appointed on the following dates: Byoung See Ou, appointed March 31, 2001, re-appointed March 31, 2004, and re-appointed March 27, 2007; Jin Ah Cho, appointed March 31, 2004, and re-appointed March 27, 2007; Byoung Seung Yoo, appointed March 31, 2006.[5] (*Id.* at 1–3.) The registry also shows that Mr. Ou was the "representative director," (*id.* at 1), which means that he was the chief executive officer, (Hearing Tr. At 140).[6] *See also* Chanho Park, *Commercial Law*, *in* Introduction to Korean Law 202 (Korea Legislation Research Institute, ed., 2013).

Under Article 383(2) of the Korean Commercial Act,[7] a director's term may not exceed three years, and the entries on the corporate registry described above indicate that Original TS

---

[5] Mr. Ou, the only witness at the hearing, testified that the two directors other than he—Cho and Yoo—were appointed as a matter of corporate formality only. He testified that neither of these two were employed by or had any operational role in Original TS. Further, he made clear that Original TS, as a small business of only five or six employees, did not devote resources to observing corporate formalities, and expressed frustration that Sonics was raising challenges that, in his view, ignored the practical realities of the way the business was run. While I understand Mr. Ou's frustration, I note that Original TS chose to organize itself as a stock corporation under Korean law, and is thus bound by the requirements of the Korean Commercial Act—regardless of the size of the business or the way it was actually operated.

[6] The word for "director" in Korean is 이사. 이사 can mean board member, director, or representative director. The Korean word for "representative director" is 대표이사. *Minjung's Essence Korean-English Dictionary* 1492–93 (3d ed. 1997); (*see* Pl.'s Ex. 1 at 1, 4 (using이사. 이사 and대표이사)).

[7] The Korean-language print version of *The Current Statutes of the Republic of Korea* is the only complete and official collection of Korean acts. Kipyo Kim, *Overview*, *in* Introduction to

appointed its directors for three-year terms. *See* Commercial Act, Art. 383(2) (S. Kor.) ("The term of office of directors shall not exceed three years."). Thus, according to the registry, Byoung See Ou's and Jin Ah Cho's tenures as directors expired on March 27, 2010, while Byoung Seung Yoo's expired on March 31, 2009. There is no entry on the registry and there was no evidence presented at the hearing that any director was appointed to a term that extended beyond March 27, 2010, let alone to the time of the purported assignment in 2011.

Nonetheless, under Article 386(1) of the Korean Commercial Act, "[a] director retiring from office due to the expiration of his/her term of office or due to resignation shall continue to have the rights and obligations of a director until a newly elected director takes office, if the number of directors remaining in office would otherwise become fewer than the minimum number prescribed by Acts or by the articles of incorporation." Commercial Act, Art. 386(1). The "Acts" referred to in Article 386(1) refer to other provisions of the Commercial Act, which specify that in a stock corporation, "[t]he number of directors shall be three or more." Commercial Act, Art. 383(1). In May 2009, an amendment to this provision allowed for as few as one or two directors in companies with total capital of less than one billion won; that is, the amendment raised the capital threshold for an exception allowing fewer than three directors, which, since 1998, had been less than 500 million won. Commercial Act, Art. 383(1); (Ri Bong Han Dep. at 49, Jan. 5, 2015, ECF No. 153).[8]

---

Korean Law 12 (Korea Legislation Research Institute, ed., 2013). Here, I rely primarily on the translations provided by the parties. An English translation of the Commercial Act can be found at Korea Legislation Research Institute, http://elaw.klri.re.kr/eng_service/main.do (search "Search by Statutory Current" for "Commercial Act"; then follow "Commercial Act" hyperlink under "Law name") (last visited June 6, 2016).

[8] Attorney Han is a Korean lawyer retained by the defendant. I considered his deposition testimony on this issue, along with statements made at the hearing by a second Korean lawyer retained by the defendant. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party

Thus, for most of the duration of the terms of the directors shown on the corporate registry, Original TS was required by the Korean Commercial Act to have three directors, inasmuch as the registry reflects that it has capital of 500 million won.

With the amendment of May 2009, if the articles of incorporation did not require more directors, Original TS was permitted to have only one director under the Korean Commercial Act. But according to Attorney Ryoo, *see supra* note 8, Original TS would have had to change its articles of incorporation to allow it to have a single director, (Hearing Tr. at 132–33). There was no evidence presented about the content of Original TS's articles of incorporation. Mr. Ou testified that he could not remember whether he had ever seen articles of incorporation and, if they existed,

---

or admissible under the Federal Rules of Evidence.") The two attorneys were well-qualified, and I found their input to be helpful and consistent with the language of the English translations of the Korean Commercial Act that counsel provided. Further, Attorney Han was examined by both sides at the deposition. The Korean lawyer who appeared at the hearing—Attorney Jongkwon Ryoo— had been Attorney Han's more junior colleague and was, at the time of the hearing, studying to obtain a L.L.M. degree at New York University. Attorney Ryoo is licensed to practice in Korea and his practice almost exclusively involves corporate law and mergers and acquisitions. (Hearing Tr. at at 126–29.) He has counseled Korean businesses with a similar number of employees and capitalization as Original TS. (*Id.* at 146–47.) Both plaintiff's counsel and I asked questions of Attorney Ryoo at the hearing.

Finally, I note that plaintiff's counsel's assertion at the hearing that I may not rely on the legal opinions of Attorneys Han and Ryoo, to the extent they embrace the ultimate issue of the validity of the assignment, is incorrect. The plaintiff's attorney cited *In re Initial Public Offering Securities Litigation*, 174 F. Supp. 2d 61 S.D.N.Y. (2001). She said that the case involved a foreign law expert and stood for the proposition that it is impermissible for a court to rely on a foreign legal expert's opinions or legal conclusions. The case did not involve foreign law experts. It involved two United States law professors who submitted opinions about the United States law of judicial recusal. The plaintiff's counsel overlooked the part of the opinion where the court said "when interpreting foreign law, expert legal opinion may be allowed." *Id.* at 65. Although the plaintiff complains that it was not adequately apprised that Attorney Ryoo would be speaking at the hearing, I repeatedly asked the plaintiff's attorney what process she wished to have as a result. (Hearing Tr. at 6–7.) The plaintiff's attorney requested the opportunity to submit additional briefing, which I granted. (*Id.*) At the hearing, the plaintiff was also provided the opportunity to question Attorney Ryoo, whose testimony was substantially similar to Attorney Han's testimony in an earlier deposition. Finally, I considered affidavits submitted by a South Korean lawyer on behalf of the plaintiff as part of the post-hearing submissions.

he knew nothing of their content. (*Id.* at 64.) At least from 2003 to May 2009, Original TS was required by the Korean Commercial Act to have three directors and, unless its articles of incorporation were contrary to Korean law, they must have specified three during this period. Both Attorney Han and Attorney Ryoo made clear that a Korean stock corporation's articles of incorporation may not permit fewer directors than the minimum set forth in the Korean Commercial Act. (*E.g.*, Hearing Tr. at 132–33.) Thus, it is reasonable to infer—from the appointment of three directors—that Original TS's articles of incorporation required three directors.

Further, as noted, even if a director were to retire at the expiration of his term or to quit his position, the director would retain his legal rights and obligations until a replacement director was appointed. Commercial Act, Art. 386; (Ri Bong Han Dep. at 99–100). Korean law required Original TS to update the corporate registry to reflect any action with respect to directors. (Ri Bong Han Dep. at 60.) There are no such updating entries on the registry. In fact, the registry continued to list all three directors—even though their terms had expired—until December 2, 2013, when they were literally crossed out as a result of the company's dissolution.[9] No evidence was presented in the form of corporate records indicating that before December 2, 2013, any of the three directors

---

[9] Specifically, the registry shows that all three directors' names were crossed out because the company was "[d]issolved pursuant to Commerce Codes Article 520-2 Clause 1 on 12/02/2013." Article 520-2, clause 1, provides:

> Where the administrator of the Office of Court Administration has given public notice in the Official Gazette that any company whose last registration was made five years ago shall make a report to the effect that it has yet to close its business to the court that has jurisdiction over the place of its principal office, if a company for which five years has already lapsed since its last registration as of the date of public notice fails to report within two months from the date of public notice in accordance with Presidential Decree, the company shall be deemed to have been dissolved at the expiration of the period set for such a report: Provided, [t]hat it shall not apply where the company has made a registration within the period.

Commercial Act, Art. 520-2(1).

retired, died, resigned, or were dismissed. In other words, any third party who might have dealt with Original TS from 2003 until 2013 would likely have concluded that the corporation had the three directors shown on its corporate registry, *i.e.*, Ou, Cho, and Yoo.

The defendant's second expert, Attorney Han, agreed with this analysis. He testified that after a May 2009 amendment to the Korean Commercial Act, a stock corporation was required to have three directors, unless the stock corporation had less than one billion won in paid-in capital, in which case the corporation could have one or two directors. (Ri Bong Han Dep. at 49.) As of December 2, 2013, Original TS was dissolved and the directors' names were crossed out on the registry. (Hearing Tr. at 146.) Immediately before this date, however, the register reflected that there were three directors, namely, Ou, Cho, and Yoo. Therefore, I conclude that Original TS had three directors at the time of the assignment in 2011, even though the document purporting to transfer the Agreement states that Mr. Ou is the sole director of Original TS. As discussed below in Part V.A, Mr. Ou could not assign the Agreement as a director if the Agreement was a major asset.

**D.      Whether Mr. Ou Was the Sole Shareholder of Original TS**

The parties dispute whether Mr. Ou was the sole shareholder of Original TS and whether a sole shareholder could have assigned the Agreement under Korean law. Based on the evidence presented by the parties, I find that Mr. Ou was the sole shareholder of Original TS. Mr. Ou's testimony on this point was admittedly unclear, but he has met his burden of showing that he was the sole shareholder. At first, Mr. Ou said that he was the only shareholder and that there were never any others. (*Id.* at 24–25.) But then Mr. Ou testified that he had given shares in name only to the board of directors:

Q:          Did TechSonic Co. ever have any other shareholders, Mr. Ou?

A:          Maybe using someone's name –

Q.          Did it have shareholders, yes or no?

A:          Yes, sometimes.

. . .

Q:          Did you testify in your deposition, Mr. Ou, that there were, in fact, three shareholders of TechSonic Co., yourself, your uncle and your sister?

A:          Beginning of when we registered TechSonic Co. it requires a three board member. So they, in order to be the board member, they got to have five percent, one percent, they got to have something so they can be a board member. So we just give them name. They have nothing to do with anything shared, actual anything. It is five, six people company.

(Hearing Tr. at 114–15.) Later, Mr. Ou said that at some point he became the sole shareholder:

The Court:   So here's my question for you. . . . I'm asking you whether there were other shareholders of TechSonic Co.?

A:          No, sir.

The Court:   Now, counsel just pointed out or said that you testified in your deposition that there were other shareholders of TechSonic Co. So which is it?

A:          TechSonic shareholder I mean as a member of board, because they member of board has to have a share all that. But my understanding of TechSonic Co.'s share, just before 2008 to apply Korea taxes. Cho told me that I am the only one shareholders, because nobody want to be responsible for TechSonic Co. So I think [my attorneys] took it back to put in me myself so they don't want to do anything. Why the want responsible for any legal thing if they're going to be splitting company to Kormax and they move there.

. . .

The Court:   Did you check with [Korean authorities about the number of shareholders] before you signed [the purported assignment]?

A:              No, I didn't check. . . .

(*Id.* at 117–18.)

As noted, at the hearing Mr. Ou had difficulty expressing himself in English. Any apparent discrepancy in his testimony is likely due to a language barrier. Accordingly, I find that Mr. Ou was the sole shareholder of Original TS.

### E.    The Nature of the Agreement

At the time of the purported assignment, the Agreement was virtually the only remaining asset of Original TS other than an interest in TS Beijing. (*See* Hearing Tr. at 38, 40, 42, 46–48, 53–54; Pl.'s Ex. 2 at 1.) According to the defendant's characterization of the plaintiff's damages report, which the plaintiff does not dispute, the breach of contract claim that was purportedly assigned to TS USA is worth up to $3.2 million. (ECF No. 163 at 10.)

After the evidentiary hearing, the Court invited the parties to address whether the Agreement was a major asset at the time of the purported transfer by supplementing the evidentiary record "with special consideration given to the size of Original TS in terms of its revenue, the relative value of the asset compared to Original TS's other assets (both before and after the purported transfer), the amount of revenue that the asset generated relative to revenues the company generated when it was operating, and any other pertinent consideration." (Order for Supplemental Briefing, ECF No. 165.) Both parties submitted supplemental briefing and supporting affidavits. (ECF Nos. 166–67.) According to TS USA, at the time of the purported assignment, Original TS was winding up and the Agreement was not being used. (ECF No. 166 at 5.) However, the plaintiff's submissions did not show the relative value of the Agreement to Original TS's other assets and revenue or the amount of revenue generated by the Agreement during Original TS's operation. The absence of such evidence leads to the reasonable inference that the Agreement was the most valuable asset belonging to Original TS at the time of the

13

purported assignment. As discussed below, given this factual record, the plaintiff has not met its burden of showing the Agreement was not a "major asset" by a preponderance of the evidence. *See Aurecchione*, 426 F.3d at 638 (the plaintiff bears the burden of establishing standing under Article III by a preponderance of the evidence).

In sum, I find that, at the time of the purported transfer in 2011, Original TS possessed the Agreement, that Original TS had three directors, that Mr. Ou was the sole shareholder of Original TS, and that the Agreement was the most valuable asset owned by Original TS.

## V.    Conclusions of Law

"[T]he law of the state of incorporation normally determines issues relating to the internal affairs of a corporation because [a]pplication of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." *NatTel, LLC v. SAC Capital Advisors LLC*, 370 F. App'x 132, 134 (2d Cir. 2006) (applying Connecticut choice-of-law provisions) (internal citations and quotations omitted). Original TS was incorporated in South Korea. Therefore, South Korean law controls whether Original TS's purported transfer of the Agreement to TS USA was an effective corporate act. The application of South Korean law, specifically the Korean Commercial Act, raises the following issues: (1) did Mr. Ou as representative director and as one of three board members have authority unilaterally to assign the Agreement, and (2) did Mr. Ou as the sole shareholder have authority to assign the Agreement via shareholder resolution.[10]

_____

[10] The plaintiff states that "any challenge brought by Sonics as to the non-validity of the Assignment must be brought within the exclusive jurisdiction of the courts in Korea. Since it has not been challenged or found to be invalid by any Korean Court, this Court should accept the Assignment on its face as valid and enforceable." (ECF No. 162 at 4.) Thus, the plaintiff suggests that this Court does not have jurisdiction to determine its own jurisdiction because the Korean Commercial Act vests exclusive jurisdiction over challenges to the validity of the 2011 Assignment in the South Korean courts. This argument misstates both United States law and South

### A.    Whether a Representative Director or a Single Member of the Board of Directors Had Authority to Assign the Agreement Without a Board Resolution

The Korean Commercial Act limits the authority of representative directors, *i.e.*, chief executive officers, to dispose of certain assets by requiring a "resolution of the board of directors . . . for [the] disposal or transfer of major assets . . . ." Commercial Act, Art. 393(1); (Hearing Tr. at 132). Thus, a preliminary question is whether the Agreement was a major asset. If it was a major asset, then Mr. Ou as the representative director or as a board member acting alone could not have assigned the Agreement.

### 1.    Whether the Agreement Was a "Major Asset"

Although the term "major asset" is not defined under Korean law, Attorney Ryoo opined that a Korean court would look to the "totality of the circumstances" to determine whether something is a "major asset" by examining the size of the business, the relative value of the asset compared to the company's other assets, and the amount of revenue that the asset generated.

---

Korean law. Under United States law, a court "always has jurisdiction to determine its own jurisdiction." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 (1998) (Stevens, J., concurring); *United States v. Mine Workers*, 330 U.S. 258, 290 (1947). And the exclusive jurisdiction provisions of South Korean law on which the plaintiff relies do not apply to this lawsuit.

In South Korea, the Korean district court that has jurisdiction over the place of the principal office of a company has exclusive jurisdiction over lawsuits brought to challenge certain corporate actions. Commercial Act, Arts. 186, 380. The plaintiff relies in part on Article 380, entitled "Lawsuit Seeking Confirmation of Non-validity or Non-existence of Resolution." That provision is inapposite; it applies to "a lawsuit seeking confirmation of the non-validity of a resolution," but this is not such an action because this case was not brought to invalidate a corporate resolution, but to enforce a contractual right. Commercial Act, Art. 380.

The plaintiff also argues that the defendant is time-barred from contending that the Assignment is invalid. The plaintiff relies on Article 376, entitled "Lawsuit for Revocation of Resolutions," which provides that a shareholder, director, or auditor "may file a lawsuit to revoke [an illegal] resolution" within two months of the resolution. Commercial Act, Art. 376(1). As with Article 380, Article 376 does not apply to this case because this is a contract action, not a lawsuit to revoke an improper resolution.

(Hearing Tr. at 135–36.) A contract can qualify as a major asset under Article 393. (Ri Bong Han Dep. at 76–77.)

Here, the Agreement was a major asset within the meaning of Article 393(1). As stated above in my factual findings, at the time of the purported assignment, the Agreement was virtually the only remaining asset of Original TS other than an interest in TS Beijing. (*See* Hearing Tr. at 38, 40, 42, 46–48, 53–54; Pl.'s Ex. 2 at 1.) The breach of contract claim that was purportedly assigned to TS USA is worth up to $3.2 million. (ECF No. 163 at 10.) While it may be true that Original TS was winding up and that the Agreement was not being used at the time of the purported transfer, (ECF No. 166 at 5), the plaintiff has not shown that the Agreement was not a major asset of Original TS under the totality of the circumstances. The absence of evidence of more valuable assets and the undisputed $3.2 million value of the Agreement leads to the reasonable inference that the Agreement was a major asset belonging to Original TS. Further, the plaintiff's own Korean-law expert concedes that a Korean court could consider the Agreement to be a major asset.[11]   (ECF No. 166-1 at ¶ 16.) For these reasons, the Court finds that the Agreement was a major asset under the totality of the circumstances.

> 2. *Whether the Assignment Was an Effective*
> *Board Resolution or Act of a Representative Director*

The next issue is whether Mr. Ou as the representative director or as a member of the board of directors had authority to assign the Agreement, a major asset of Original TS, given that Original TS had three directors and that no board meeting was held to effectuate the assignment. For the reasons discussed below, I conclude that he did not.

---

[11] The plaintiff submitted an affidavit by a Korean lawyer who opines on Korean Supreme Court rulings. (ECF No. 166-1 at 1–7.) The legal conclusions are not especially helpful to the Court because the plaintiff has not provided copies of specific Korean cases to aid the Court's analysis of Korean law.

Neither the representative director nor the board of directors could dispose of the Agreement, a major asset, without a board resolution. Commercial Act, Art. 393(1); (Hearing Tr. at 132). Mr. Ou testified that he did not call a meeting of the board of directors prior to making the purported assignment. (Hearing Tr. at 113–14.) The purported assignment in 2011 was an ineffective attempt to transfer the right to sue under the Agreement from Original TS to TS USA because there was no board meeting as required by Article 393(1) of the Korean Commercial Act. Thus, Mr. Ou lacked authority to transfer the Agreement to TS USA in his role as representative director or as one of three board members.

### 3. Whether a Board Resolution Was Required Because Original TS Was in Dissolution

The plaintiff argues that Mr. Ou could act independently as a "liquidator" to assign the Agreement because Original TS was in dissolution. When a Korean stock corporation files for dissolution, the directors become "liquidators" who settle the corporation's accounts by paying the corporation's creditors and distributing surplus assets to the shareholders. Commercial Act, Arts. 531, 536–38. Thus, even if Original TS was in dissolution in 2011, its three directors did not cease to act on behalf of Original TS because the three directors became three "liquidators." Commercial Act, Art. 531(1). Article 393, which requires a resolution of the board of directors to transfer major assets, applies *mutatis mutandis* to liquidators. Commercial Act, Art. 542. Therefore, a resolution of the liquidators would be required to transfer a major asset. As there is no evidence that a meeting of the three liquidators was held to pass a resolution disposing of a major asset, the Assignment was not a valid act by Mr. Ou as a liquidator under the Korean Commercial Act.

17

**B.       Whether the Assignment Was Effective as the Act of a Sole Shareholder**

The Court inquired of the parties whether Mr. Ou could act as the sole shareholder to transfer the Agreement by resolution under the Korean Commercial Act. (ECF No. 165.) Under Article 361, "[a] general meeting of shareholders may adopt resolutions as to matters provided for by this Act or the articles of incorporation." Commercial Act, Art. 361. The plaintiff's expert stated, however, that "with respect to shareholder resolutions, there is no provision [in the Commercial Act] that . . . general meetings [of shareholders] could be held to approve or adopt a resolution to transfer a major asset." (ECF No. 166-1 at ¶ 6.) The expert's reasoning, which I find persuasive, is that the Korean Commercial Act identifies each situation in which a general shareholder meeting may pass a resolution and that a resolution to dispose of major assets is not one of the enumerated situations. (*Id.*); *e.g.*, Commercial Act, Art. 388 (remuneration for directors).[12] Accordingly, under Korean law Mr. Ou lacked authority as the sole shareholder to adopt a resolution to assign the Agreement, which was a major asset.

---

[12] In a separate portion of the plaintiff's expert declaration, the expert states that "Mr. Ou, as sole shareholder, can adopt a written shareholder resolution which would dispose of or transfer a major asset of [Original TS] without a general or special meeting." (ECF No. 166-1 at ¶ 10.) The expert's argument does not support his conclusion. The expert notes that, in a stock company that is "substantially a one man company," defects in the procedures and minutes of a shareholder's meeting do not invalidate the meeting. (*Id.* at ¶ 9.) He also states that under Korean law, "substantially one man" companies do not need to convene general or special meetings of the sole shareholder. (*Id.* at ¶ 10.) Finally, the expert notes that "even if minutes of the shareholders' meeting do not exist, the shareholder meeting resolution can be seen by proper evidences," including "a written document." (*Id.*) While each of those propositions may be accurate statements of Korean law, it does not follow from them that "Mr. Ou, as sole shareholder, can adopt a written shareholder resolution which would dispose of or transfer a major asset of [Original TS] without a general or special meeting." (*Id.* at ¶ 10.) It is one thing for a court to excuse informalities in a shareholder's meeting in a closely held corporation; it is another to confer on the shareholder's meeting powers that applicable law does not grant it.

### C.      Article III Standing

"Lawsuits by assignees . . . are cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Sprint Communications Co.*, 554 U.S. at 285 (quotations and citations omitted). TS USA has not shown that it is an assignee of the Agreement. Therefore, TS USA does not have standing to bring this suit.

## VI.      Amendment Under Federal Rule of Civil Procedure 17

TS USA has asked for leave to amend its complaint under Federal Rule of Civil Procedure 17 in the event that I determine that the assignment of the Agreement was ineffective. (ECF No. 162 at 13.) I deny the request because Rule 17 cannot be used to overcome a jurisdictional defect in this context.

Rule 17 was adopted to address a common-law practice that prevented "[p]ersons who possessed only equitable or beneficial interests, such as assignees and subrogees, [from bringing suit] in their own names." 6A Fed. Prac. & Proc. Civ. § 1541 (3d ed. 2010). "Rule 17 does not . . . affect jurisdiction and relates only to the determination of proper parties and the capacity to sue." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193–94 (2d Cir. 2003). Here, although Mr. Ou, as the representative director of Original TS and the principal of TS USA, is the driving force behind this litigation, neither he nor TS USA is the real party in interest because neither is an assignee of the Agreement.

### A.      The Law on Whether Rule 17 Can Cure a Defect in Standing Is Unsettled

Rule 17 "address[es] party joinder, not federal-court subject-matter jurisdiction." *Lincoln Property Co. v. Roche*, 546 U.S. 81, 90 (2005) (citing Fed. R. Civ. P. 82 ("[The Federal Rules of Civil Procedure] shall not be construed to extend or limit the jurisdiction of the United States district courts . . . .")). Although the law surrounding Federal Rule of Civil Procedure 17 is unsettled in this context, Rule 17 cannot be used to create jurisdiction where none exists.

19

Rule 17 requires "that an action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." *Oscar Gruss & Son, Inc.*, 337 F.3d at 193 (quotations and citations omitted). The text of the rule states that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Thus, the rule explicitly addresses dismissing a case due to inartful pleading of the proper party; the text does not address dismissing a case for lack of jurisdiction. However, as discussed below, courts have allowed Rule 17 amendments prior to dismissing a case for want of jurisdiction due to a party's lack of standing.

### B.   The Second Circuit Has Allowed the Use of Rule 17 to Cure a Defect in Standing if the Court Has Jurisdiction Over at Least One Claim

The Second Circuit has recently issued a summary order holding that where there is a single plaintiff and that plaintiff is not the real party in interest and lacks standing to bring all of its claims, a federal court lacks jurisdiction and cannot grant a request to ratify, join, or substitute a party under Rule 17. *Valdin Investments Corp. v. Oxbridge Capital Mgmt., LLC*, No. 15-2032-CV, 2016 WL 3190509, at *1 (2d Cir. June 1, 2016) (summary order).

While *Valdin* would appear to dispose squarely of the issue before me, summary orders do not have precedential effect under the Second Circuit's rules. *Lebron v. Sanders*, 557 F.3d 76, 77 n.2 (2d Cir. 2009); Local Rule of the Second Circuit 32.1.1. The panel in *Valdin* relied on *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.à.r.l*, 790 F.3d 411 (2d Cir. 2015) and *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11 (2d Cir. 1997). The court in *Valdin* held:

> Ordinarily, we would permit the real party in interest to ratify, join, or be substituted into the action pursuant to Rule 17(a)(3) of the Federal Rules of Civil Procedure. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20–21 (2d Cir.1997). Here, however, Valdin, the sole plaintiff, lacked standing on all of its

claims. Its motion was therefore "a nullity" from the beginning, so that there is "no
lawsuit pending for the real party in interest to 'ratify, join, or be substituted into'
under Rule 17(a)(3) or otherwise."

*Valdin Investment Corp.*, 2016 WL 3190509, at *1 (quoting *Cortlandt St. Recovery Corp.*, 790

F.3d at 423) (footnotes omitted).

The portion of *Cortlandt* that the panel in *Valdin* quotes is arguably the Second Circuit's

summary of the district court opinion in that case, not the opinion of the Court of Appeals. *See*

*Cortlandt St. Recovery Corp.*, 790 F.3d at 422–23 ("The district court reasoned . . . . The court

also noted . . . . In other words, in the absence of a plaintiff with standing, this lawsuit was a nullity,

and there was therefore no lawsuit pending for the real party in interest to 'ratify, join, or be

substituted into' under Rule 17(a)(3) or otherwise.") Further, even if the panel in *Cortlandt*

approved of the district court's rationale, its approval is dicta because the panel expressly reserved

its judgment on that issue:

> The question whether a plaintiff may use Rule 17(a)(3) to remedy a
> standing deficiency when it lacks standing as to all of its claims—as is the case
> here—appears to be an issue of first impression in this Court, if not the district
> courts in this Circuit. . . .
>
> We need not, however, resolve this question to dispose of Cortlandt's
> request to attempt to cure the standing defect under Fed. R. Civ. P. 17(a)(3). We
> affirm because neither of the requests made by Cortlandt in its effort to cure the
> standing problem would have been consistent with Rule 17(a)(3). Therefore, the
> district court's decision to deny relief under that rule was not an abuse of
> discretion.

*Cortlandt St. Recovery Corp.*, 790 F.3d at 423.

The earlier Second Circuit case cited in *Valdin* on this issue was *Advanced Magnetics, Inc.*

*v. Bayfront Partners, Inc.*, 106 F.3d 11 (2d Cir. 1997).  *Advanced Magnetics* might be read,

contrary to *Valdin*, to support the use of Rule 17 to remedy a standing deficiency when a plaintiff

lacks standing to bring all of its claims. However, for the reasons discussed below, *Advanced*

*Magnetics* and *Cortlandt* are not at odds.

In *Advanced Magnetics*, the Second Circuit emphasized that Rule 17(a) is designed to prevent the injustice of a party's forfeiting a meritorious claim simply because the incorrect party was named in a complaint. *See id.* at 20. The court underscored that "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Id.* Ultimately, the court concluded that a corporation that brought suit on its own behalf and as an assignee of claims belonging to its shareholders should have been allowed to amend its complaint under Rule 17(a) to substitute the shareholders as plaintiffs for one of its claims. *See id.* at 21. In doing so, the court emphasized that granting leave to amend in that manner would promote the just disposition of the claims:

> Nor do we see any unfairness to defendants in allowing substitution of the selling shareholders as plaintiffs on their respective claims. The original complaint plainly gave defendants the particulars of the selling shareholders' claims, and the attempt to substitute the selling shareholders was made within a reasonable time. Leave to amend was requested even prior to defendants' motion to dismiss, and the request was renewed in response to defendants' first formal "objection," *i.e.*, their motion to dismiss. [The corporate plaintiff] and the selling shareholders erred in believing that their assignment agreements had the legal effect of permitting the claims to be pursued in the name of [the corporate plaintiff]. If, as alleged, however, defendants violated the pertinent securities laws and thereby caused the selling shareholders to lose thousands of dollars, it would be unjust to allow defendants to foreclose pursuit of those claims by taking advantage of that otherwise inconsequential error.

*Id.*

*Advanced Magnetics* is distinguishable from this case. In *Advanced Magnetics*, the single corporate plaintiff brought two claims: "(1) claims on behalf of [the corporate plaintiff] as an assignee of certain of its shareholders, and (2) claims under § 10(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(a) (1994), and Rule 10a–1, 17 C.F.R. § 240.10a–1 (1996), promulgated thereunder." *Advanced Magnetics, Inc.*, 106 F.3d at 13.

22

The district court in *Advanced Magnetics* dismissed the first set of claims for lack of standing and the second set of claims for failure to state a claim. *Id.* Notably, the district court dismissed the second set of claims on the merits, which it could not have done had it determined that the plaintiff lacked standing to assert those claims. *See In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 101 (2d Cir. 2015) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex Parte McCardle*, 74 U.S. 506, 514 (1868)).

The district court denied leave to amend under Federal Rule of Civil Procedure 15. *Id.* at 18 ("[T]he court denied that request, citing the Rule 15(c)(3) statute-of-limitations rationale stated in its 1994 denial of AMI's original request for leave to amend . . . ."). The Second Circuit vacated the district court's judgment dismissing the first set of claims and denying leave to amend under Rule 15:

> Whether or not the amended complaint would relate back under Rule 15(c), however, we conclude that the court erred in limiting its focus to Rule 15. The request to make the selling shareholders the named plaintiffs on their own claims should have been considered in light of Fed. R. Civ. P. 17, and the amendment should have been found to relate back pursuant to Rule 17(a).

*Id.* at 13, 18–19. *See also id.* at 20 ("We see no good reason why Rule 17(a) should not have been applied here . . . .").

As for the second set of claims, the Second Circuit did not reach the issue of whether the district court properly dismissed the claims on the merits because the Second Circuit dismissed the premature appeal of those claims for lack of appellate jurisdiction. *Id.* at 13, 22. In doing so, the Second Circuit noted that the plaintiff raised "excerpts of legislative history that were not presented to the district court" that might show that the second set of claims were cognizable. *Id.* The Second Circuit also noted that the plaintiff could "ask the district court to revisit its ruling in light of the

23

newly discovered history." *Id.* at 22. Thus, the dicta in *Cortlandt* and the holding in *Valdin* are consonant with the holding in *Advanced Magnetics* insofar as all three cases allow Rule 17 to be used to cure a standing defect when doing so is a merely formal change and at least one party to the suit had standing to assert at least one claim.

Further, *Advanced Magnetics* is distinguishable from this case because, as discussed above, the court in *Advanced Magnetics* had jurisdiction to hear at least one of the plaintiff's claims.[13] Here, all of the plaintiff's claims are based on its alleged status as an assignee of the contract owned by Original TS. However, because TS USA is not the assignee of the contract in question, it never had standing to assert any of the claims in this case. This case is more like *Cortlandt* and *Valdin* than *Advanced Magnetics*.

Like the plaintiffs in *Cortlandt* and *Valdin*, TS USA is the only plaintiff in this case and lacks standing to pursue all of its claims. *See Cortlandt St. Recovery Corp.*, 790 F.3d at 414–19; *Valdin*, 2016 WL 3190509, at *1. Therefore, Rule 17 cannot be used to cure the defect in standing.

At least one district court has questioned the importance of the distinction made in *Cortlandt* about *Advanced Magnetics*, namely that in *Advanced Magnetics* the court had jurisdiction over at least one claim. *Digizip.com, Inc. v. Verizon Services Corp.*, 139 F. Supp. 3d 670, 678 (S.D.N.Y.) (Gorenstein, M.J.). In that case, on which the plaintiff relies in its brief, the court explained:

---

[13] Also, unlike in *Advanced Magnetics*, the plaintiff in this case has not sought leave to amend under Federal Rule of Civil Procedure 15. Further, unlike the panel's suggestion in *Advanced Magnetics*, the plaintiff in this case has not asked that I revisit any prior ruling dismissing the plaintiff's former claims on the ground that newly discovered material might merit reconsideration. *See id.* at 22. In any event, I likely do not have jurisdiction over those claims either, because they were brought under the invalid Assignment.

The distinction *Cortlandt Street* noted was that in *Advanced Magnetics* the plaintiffs had standing at the time of the filing of the complaint as to "at least some of its claims against the defendants" irrespective of the potential cure as to other claims offered by Rule 17(a)(3). 790 F.3d at 422. We question, however, why this circumstance should matter. Putting aside the fact that the existence of the plaintiffs' other claims did not form any part of *Advanced Magnetics*' legal analysis, judgments about standing are made based on an independent analysis of each particular claim. Thus, it occasionally arises that some claims are dismissed for lack of standing while others are not. *See, e.g.*, *Weisshaus v. New York*, [No. 08 Civ. 4053 (DLC),] 2009 WL 2579215 (S.D.N.Y. Aug. 20, 2009). If it is truly the case that the Rule 17(a)(3) procedure cannot cure a lack of standing as to a particular claim, there is no reason why the existence of standing as to some other claim should operate to invest Rule 17(a)(3) with the power to revive the claim that was infirm due to lack of standing. Put another way, if a party has standing as to one claim, there is no reason why that fact should affect the analysis of standing as to a different claim.

*Id.*

I respectfully disagree with the reasoning in *Digizip.com* on this point. The court's statement that "if a party has standing as to one claim, there is no reason why that fact should affect the analysis of standing as to a different claim" misapprehends the distinction made in *Cortlandt* and reflected in *Valdin*. The court in *Cortlandt* did not suggest that the fact that a party has standing on one claim affects the standing analysis as to a different claim. Rather, *Cortlandt* distinguished *Advanced Magnetics* on the ground that "the named plaintiff [in *Advanced Magnetics* had] standing irrespective of any amendment under Rule 17 to pursue at least some of its claims against the defendants; Cortlandt did not." *Cortlandt St. Recovery Corp.*, 790 F.3d at 422. Thus, *Cortlandt* does not imply that a party's standing on one claim affects its standing on another claim. Rather, *Cortlandt* suggests that a court's lack of jurisdiction over a case, because the single plaintiff lacks standing to assert any of its claims, affects whether the court has jurisdiction to entertain a motion under Rule 17 because no case or controversy is before it.

In any event, *Digizip.com* is distinguishable because the court in *Digizip.com* held that the plaintiff in that case had Article III standing but lacked prudential standing, a defect the court determined Rule 17 could cure. *Digizip.com, Inc.*, 139 F. Supp. 3d at 678–80. Thus, the issue presented in this case is not the same issue faced by the court in *Digizip.com*. Unlike there, the plaintiff in this case lacks Article III standing.

In addition, several district courts have held that Rule 17 cannot cure a jurisdictional defect under circumstances similar to this case. *Cortlandt St. Recovery Corp.*, 790 F.3d at 422 (citing *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 CIV. 0722 PAE, 2012 WL 4849146, at *7–*8 (S.D.N.Y. Oct. 12, 2012)). For example, Judge Engelmayer rejected an argument that a plaintiff who lacked standing could remedy the jurisdictional defect under Rule 17, noting that "where courts in this Circuit have used . . . Rule 17(a)(3) to remedy defects in standing, they have generally done so where the plaintiff clearly had standing on another claim that it brought." *Clarex Ltd.*, 2012 WL 4849146, at *7–*8 (citing *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 115 (S.D.N.Y. 2009)). As Judge Engelmayer explained:

> In *Advanced Magnetics*, for example, on which plaintiffs rely, the plaintiff corporation brought the action on behalf of itself and its shareholders, but only had standing for its own claims and not for those of its shareholders. *Advanced Magnetics*, 106 F.3d at 14–21. In that situation, the Second Circuit held that substitution was appropriate as to the latter claims. The salient point is that the plaintiff corporation had already established its standing as to its own claims.

*Id.* at *8.

Likewise, Judge Pauley noted that "the majority of courts to allow an assignment of claims after the onset of litigation do so only where plaintiff had constitutional standing on another claim." *In re SLM Corp. Sec. Litig.*, 258 F.R.D. at 116. Judge Seybert has also distinguished *Digizip.com* on the grounds discussed above, and held that a single plaintiff could not invoke "the 'real party in interest' theory" to cure a standing defect using Rule 17 because the plaintiff had failed to seek

substitution under Rule 17 within a reasonable time. *Scienton Techs., Inc. v. Computer Associates Int'l, Inc.*, No. 04-CV-2652(JS)(ARL), 2016 WL 2888996, at *7–*8 (S.D.N.Y. May 17, 2016), *appeal docketed*, No. 16-1995 (2d Cir. June 16, 2016). Judge Cogan has also rejected the attempt of a plaintiff who lacked standing to avoid dismissal using Rule 17, reasoning that the rule could not "retroactively cure the jurisdictional deficiency . . . ." *Bd. of Managers of Mason Fisk Condo. v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 39–40 (E.D.N.Y. 2011) (citing, inter alia, *Lincoln Prop. Co.*, 546 U.S. at 90; *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532 (6th Cir. 2002)).

Accordingly, Rule 17 cannot be used to cure an Article III standing defect if the court does not have jurisdiction over a particular case, for example, as when a single plaintiff lacks standing to assert the single claim in the case. *See Cortlandt St. Recovery Corp.*, 790 F.3d at 423 (suggesting in dicta that "in the absence of a plaintiff with standing, this lawsuit was a nullity, and there was therefore no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise"); *see also Valdin Investments Corp.*, 2016 WL 3190509 at *1 (holding that a sole plaintiff who lacks standing on all of its claims cannot bring a motion under Rule 17 for the real party in interest to ratify, join, or be substituted into the case). *Cf.* Fed. R. Civ. P. 82 ("These rules do not extend or limit the jurisdiction of the district courts or the venue of actions in those courts.").

### C.   Rule 17 Does Not Allow an Amendment To Allege a New Assignment To Cure a Defect in Standing

Even if the Second Circuit would not follow the dicta in *Cortlandt* and the holding in *Valdin*, the plaintiff is still not entitled to amend under Rule 17. *Cortlandt* ultimately affirmed the district court's denial of leave to amend under Rule 17 on a narrower ground than the one it had discussed in dicta, *i.e.*, because the plaintiff's requests to amend "in its effort to cure the standing

problem would [not] have been consistent with Rule 17(a)(3)." *Cortlandt*, 790 F.3d at 423. One of those requests was "for leave to obtain a new assignment" to vest the plaintiff with "sufficient title to maintain [the] lawsuit." *Id.* When a plaintiff's "legal claims might remain unaltered if a new assignment were substituted for the old one, but the factual allegations supporting them would not," Rule 17 cannot be used to cure a defect in standing. *Id.* at 414, 424. Here, as in *Cortlandt*, "pleading the existence of a new and substantively different assignment," or the joining or ratification of this lawsuit by Original TS "would require more than a 'merely formal' alteration of the complaint." *Id.* (citing *Advanced Magnetics*, 106 F.3d at 20). For example, TS USA would have to allege that Original TS validly assigned the Agreement to TS USA—or Original TS, once substituted, would have to amend the existing language regarding assignment of its rights. This is not the merely formal alteration of a complaint permitted by the Second Circuit under Rule 17. *Advanced Magnetics*, 106 F.3d at 20. Further, the plaintiff has not requested leave to amend under Rule 15. Therefore, even if the Second Circuit were to hold that Rule 17 can be used to cure a jurisdictional defect in this context, I would deny leave to amend under Rule 17 because Rule 17 does not permit more than a "merely formal" alteration of the complaint. *Cortlandt*, 790 F.3d at 424 (citing *Advanced Magnetics*, 106 F.3d at 20).

In sum, TS USA is the single plaintiff and, as discussed above, lacks standing to bring its suit against Sonics. Rule 17 cannot cure a standing defect if, as here, a court lacks jurisdiction over all the claims in the case. In the alternative, Rule 17 does not permit amendments to allege a new assignment to cure a defect in standing. Accordingly, Rule 17 cannot cure the jurisdictional defect in this case, and the request for leave to substitute under Rule 17 is denied.

**VII.     Conclusion**

For the reasons discussed above, TS USA lacks standing to sue Sonics under the Agreement between Original TS and Sonics. I DISMISS the case for lack of jurisdiction.[14]

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                July 20, 2016

---

[14] Because the issue has not been raised, and because it would be premature to do so, I do not address whether "Connecticut's accidental failure of suit statute, Conn. Gen. Stat. § 52-592, which preserves certain actions that otherwise would be barred by the running of the statute of limitations," would allow Original TS to bring suit. *Jarvis v. Levitsky*, 918 F. Supp. 50, 50 (D. Conn. 1996).